Ruffin, C. J.
 

 The plaintiffs have endeavored to establish their debt, and to prove declarations of the defendant to several persons, importing that he had given the negroes and land to his son, or that they were his. No particular communication appears between the plaintiffs and the defendant, except that it is stated by a person, who was. a'clerk for the plaintiffs, that in 1837 he informed the defendant, that his employers were not willing to trust his son further, without enquiring from him what he was worth, and whether the negroes in his possession were his, and that the defendant replied, that he had given the negroes to his son, and that he might tell Overby and Gregory that his son was as-good for $1500 as any body. On the contrary, other persons living in the neighborhood state,, that it was clearly under
 
 *256
 
 stood, generally, that Lawson Harris only had the use'of the land and negroes as a loan, at the pleasure of the father.
 

 If the cause turned, in our opinion, on the question of fact, whether the defendant had spoken in general conversations among his neighbors, of the negroes as his son’s, and as having been given to him by the defendant, or even that he had given Overby and Harris so to understand, the Court might upon the preponderance of evidence, declare the fact affirmatively, though, certainly, there is a good deal of evidence both ways. But we do not deem it material to weigh the evidence upon those points, because, admitting those facts to be for the plaintiffs, our opinion is still against them upon the law.
 

 The frame of the bill, in itself, admits, that the defendant never did give, that is to say, never did convey the slaves to his son, and that, as we conceive, is fatal to the plaintiffs’ case. The plaintiffs do not claim as purchasers of these particular slaves in the presence or with the knowledge and concurrence of the defendant. In that case he would be relieved, not upon the ground that the defendant was estopped by his fraud to deny that he had given the negroes to his son, but upon the ground, that he had induced the plaintiffs to part from their money under a belief that they were getting a good title, derived by their vendor by purchase or otherwise from the defendant or some other person. But this bill is founded simply upon the oral statements of the defendant to sundry witnesses and to the plaintiffs, that he had given the negroes to the son. To sustain it, would be directly in the teeth of the act of 1S06. For after all, what' do the defendant’s declarations amount to, but this, that he had made a parol gift to his son, whereby he became the owner of the slaves and might be dealt with as such? Upon the face of such declarations they disprove any gift, that is, any valid gift, and, therefore, in legal contemplation, they could not be deceptive. In truth, however, such declarations cannot be received at all, to establish the gift. The act of 1806 says no gifts of slaves shall be'available either
 
 *257
 
 in law or equity unless made in 'writing, signed by the donor, attested, proved and registered, with a proviso as to advancements to achild who remainsin possession until thedeath of the parent intestate. The act begins by declaring, that it was made “for the prevention of frauds.” On whom? on the alleged donor and his creditors, of course; for it can be on no one else. And the method taken to prevent the fraud,then in the view of the Legislature, is by requiring all gifts of slaves to be in writing. Consequently it excludes all parol proof, of every sort, or to any purpose. The very object is to protect the pretended donor from the fraud of having his slaves taken from him by gifts, proved by witnesses from his word of mouth at the time of the alleged gift or in the form of subsequent acknowledgments. But it is said to be a gross fraud in the defendant, thus to deceive persons induced to deal with the son both by his apparent ownership and by the defendant’s declarations. 'Certainly the possession of personal property is calculated to produce the belief of a title in the possessor; and upon that idea and the fraud that might be practised upon creditors and purchasers from the possessor, was founded the old rule laid down by the Courts, that a gift was to be presumed, when a father put slaves or other chattels into the possession of a child.
 
 Carter
 
 v
 
 Rutland,
 
 1 Hay. 97. It was admitted in the argument, that the act of 180G has abrogated this rule of the common law, implying a gift for the protection of creditors and purchasers. But it was contended, that active means, taken by the father and son to impress the public with a belief of a gift and to induce particular persons to trust the son, stand on a different footing; and should induce the Court of Equity to hold, that, although as between the fath er and son the negroes belong to the former, yet as between the father and son’s creditors they belong to the son. Such false representations may subject the party to an action at law for the deceit, as in
 
 Pasley
 
 v
 
 Freeman,
 
 3 T. R. 51, as to which it would be the same whether the false representation was as to the son’s owning particular property, or generally,
 
 *258
 
 being (rust worthy. Butin reference to a chango of the property in the slaves or creating a charge on them in equity for any purpose, the position is erroneous. For, if we ore io recejve parol evidence of this sort to establish a gift or
 
 quasi
 
 gift, we must likewise listen to similar evidence on the other side; so as to bring about all the danger of fraud and perjury the Legislature meant to exclude by'requiring a writing’. This case is an example of that danger. The answer positively denies the gift, or that the defendant ever stated that he made a gift, and there is much testimony on both sides as to the defendants conduct and the neighborhood belief. And the most express declarations carry the ease only a step beyond the presumption from long possession. So, that it cannot be said, that creditors are more likely to be deceived in one way than the other. The Court has repeatedly expressed its sense of the hardships, nay, mischiefs, arising in this respect out of the act of 1806, and supposed it would be better to hold the title to be with the possessor after a certain time, even if there were the most express evidence of a loan. For it is much more probable that purchasers or creditors of the child will be defrauded by being deceived from the possession and apparent ownership of the child, than that the parent will have a gift falsely proved on him. For the act of 1806 allows the parent to place slaves in the possession of the child, to be his, at his election, as an advancement
 
 ah initio,
 
 and yet says, that it shall create no presumption of a gift, and that nothing shall be evidence of such gift but a writing, executed according to the statute. Although this is a fraud in fact, the Court cannot hold it to be so in law; because, as was said in
 
 Hill
 
 v Hughes, 1 Dev. & Bat. 336, it would be a manifest departure from the province of the judiciary to treat, as a fraud, what a statute expressly sanctions. So, in
 
 Hamlin
 
 v
 
 Alston,
 
 1 Dev. & Bat. 479, and in
 
 Alston
 
 v
 
 Hamlin,
 
 2 Dev. & Bat. 118, we held, that the notion of a parol estoppel upon a supposed donor was inconsistent with the act of 1806, for that, by requiring a writing, it necessarily avoids every thing in parol. Therefore, for the purpose of charg
 
 *259
 
 ing these slaves with the plaintiff’s debts, they must lish an actual gift to the son, through the legal medium of written conveyance. There is no such thing as a gift to the son, in the contemplatationofthe Court of Equity, merely for the purpose of paying the plaintiffs, and not for the purposes of the son : for a gift of a slave to any purpose can only be in writing. We cannot hear parol evidence of a gift at all. The act would be entirely evaded by allowing creditors to set up this right, for, in effect, it would re-instate parol gilts, not indeed, at law, but in equity. If the plaintiffs have any right in the slaves, let them assert it at law. If the defendant committed a fraud on the plaintiffs in inducing them to trust his son, he is liable personally for it at law. But the plaintiffs have no right to satisfaction, attaching to those slaves more than to the land; therefore they cannot claim to have them sold or delivered to them.
 

 Per Curiam, Bill dismissed with costs.